IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASHET SEE, | 1:11cv0833 LJO DLB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff Mashet See ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff protectively filed for DIB and SSI on March 1, 2007. AR 132-40. She alleged

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

disability since February 1, 2007, due to "[m]ental illness disorder, hearing, ptsd Memory disorder, suicidal thoughts, emotional" and body pain from a car accident. AR 146. After being denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 83-87, 88-92, 95-99, 100. On November 18, 2009, ALJ Christopher Larsen held a hearing. AR 30-59. ALJ Larsen denied benefits on January 5, 2010. AR 14-26. On March 21, 2011, the Appeals Council denied review. AR 1-4.

Hearing Testimony

ALJ Larsen held a hearing on November 18, 2009. Plaintiff appeared with her attorney, Mr. Milam. Vocational expert ("VE") Cheryl Chandler and witness Esung See also appeared. AR 31.

At the outset of the hearing, Mr. Milam did not object to any of the exhibits of record. However, he indicated that updates from Visalia Health Clinic were missing. The ALJ agreed to leave the record open until November 30, 2009, to receive additional medical records. AR 33.

*Plaintiff's Testimony*

Plaintiff testified with assistance of an interpreter. She was born in December 1985. She lives with her parents and is not married. AR 34-35. Plaintiff initially stated that she did not have brothers and sisters, but later testified that she grew up with six sisters and that she was the youngest. AR 36. Plaintiff also stated that she did not go to school, but then reported that she went to school when she was young. She was in special classes, but went to college after high school. AR 35-37. She can read and write "a little bit" in English, but cannot read stories or books. She also cannot read a complete sentence, but can read words like the names of dogs. AR 38-39.

Plaintiff testified that she worked in the past babysitting for a friend. She did not think she could babysit on a full-time basis or five days a week because she has back pain, cannot lift anything and cannot remember anything. AR 39-40. She has taken a pill and has had shots in her back. She did not know how many shots. She has to lie down every day because of the pain, but has problems sleeping because of nightmares. AR 40-41.

Plaintiff does not shop, but goes to church once every two months. She does nothing to help out around the house. She does not make her bed, because her back hurts when she bends down.

She does not help with any of the cooking and does not do laundry. She mostly lies in her bed to pass the time. She does not watch television. AR 41-44.

In response to questions from the ALJ, Plaintiff testified that she forgot where she went to high school. She clarified that her high school classes were conducted in English and she speaks a little bit of English. Her college classes also were conducted in English. AR 45.

*Esung See's Testimony*

Esung See, Plaintiff's sister, also testified. She sees Plaintiff about three times a week for six hours. They grew up in the same household. Ms. See is not currently working and is on pregnancy leave. She just graduated with a degree as a registered nurse. AR 45-46.

Ms. See indicated that over the years her sister has had difficulty with simple things like cooking and cleaning. She has troubles with memory and being around people. AR 47-48. Plaintiff was in special education classes and sometimes needed help with English and math. Ms. See would help her with math and with homework. AR 48-49.

Ms. See explained that Plaintiff attended one or two semesters at College of the Sequoias for Child Development. At the beginning, Plaintiff tried getting the basic classes, like math and English, but she was not able to get the certificate that she needed. When asked why Plaintiff went to college if she has so much trouble with English and education, Ms. See stated that Plaintiff wanted to try and to see if she could do it. Plaintiff's parents and sisters tried to help her understand her homework. Plaintiff could not understand and would give up. She received mostly Ds and Cs. She was attending about half time and could not have made the grades she did without help. AR 50-52. According to Ms. See, Plaintiff was in the disability resource center at college and they allowed her more time to do tests, an isolated work area with no noise and resources, like calculators, that were not allowed in class. Plaintiff gave up on her schooling because she knew she was not able to keep going. AR 52-53.

Ms. See testified that Plaintiff can put things away around the house, but cannot cook or clean. She has to be reminded to put away her dishes and to shower, bathe and brush her teeth. She is withdrawn, but will play games with Ms. See's kids. AR 54. She cannot stand for a long time

3

and has to sit or lie down.  She complains about her back and Plaintiff's mom gives her medicine because she cannot take it for herself.  AR 55.

*Vocational Expert's Testimony*

Cheryl Chandler, a vocational expert, testified at the hearing.  AR 55.  For the first hypothetical, the ALJ asked the VE to assume a worker of Plaintiff's age, education and work experience who could perform light physical exertion and simple, repetitive tasks.  The VE testified that this person could perform the full RFC of light, unskilled work.  AR 56-57.

For the second hypothetical, the ALJ asked the VE to assume a worker of Plaintiff's age, education and work experience who could not maintain attention and concentration through an eight-hour workday.  The VE testified that there would not be any jobs for such a worker.  The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles and Selected Characteristics of Occupations.  AR 57.

<u>Medical Record</u>

On April 29, 2003, the Visalia Unified School District prepared an Individualized Education Program ("IEP") for Plaintiff.  The IEP team found Plaintiff eligible for special education and related services based on a specific learning disability.  Plaintiff had a severe discrepancy between her expected grade level performance and her achievement in mathematics calculation, reading comprehension and written expression.  Plaintiff's discrepancy was directly related to an auditory processing difficulty.  AR 192.  She was to receive resource specialist program services.  AR 196-97.

On February 10, 2007, Plaintiff sought emergency room treatment for body aches.  She reported being in a motor vehicle collision while driving the previous day.  On examination, Plaintiff had tenderness in her left trapezius and rhomboid.  She was diagnosed with musculoskeletal pain.  AR 205-11.

On February 14, 2007, Plaintiff sought follow-up treatment from her car accident.  She complained of back pain, left face pain and shoulder pain.  She was to remain off work until February 20, 2007.  AR 306.

1    On March 14, 2007, Plaintiff sought treatment for back pain following her motor vehicle accident. Plaintiff's mother stated that Plaintiff is short and it is difficult finding a job. Plaintiff's mother also reported aggressive behavior at times. On examination, Plaintiff's back was non tender. She was diagnosed with non-specific back pain and was advised to walk daily. The provider also recommended a psych evaluation. AR 305.

In a disability report prepared on March 2, 2007, a state agency representative noted that Plaintiff did not speak at all during the interview at the Social Security Administration. Plaintiff's mother and sister filed the disability claim while Plaintiff sat in a chair looking down at the floor. According to the representative, Plaintiff "seemed to be putting on an act." AR 249-52.

On March 19, 2007, Esung See, Plaintiff's sister, completed a Function Report - Adult form regarding Plaintiff. Ms. See indicated that Plaintiff had poor hygiene and was unable to do any household chores due to a mental disorder. Ms. See also reported that Plaintiff could not go out alone because of confusion, poor memory and being afraid of getting lost. Plaintiff did not drive and her mental disorder and physical pains affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair-climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others. AR 253-60.

On May 2, 2007, Plaintiff saw Dr. Henry Ow-Yong and complained of pain in her shoulders for two months after her accident. Dr. Ow-Yong ordered x-rays and prescribed Baclofen and Vicodin. AR 304. The x-rays were negative. AR 302-03.

On May 22, 2007, Dr. Jonathan M. Gurdin completed a consultative orthopedic examination. Plaintiff chiefly complained of back pain. Dr. Gurdin noted that Plaintiff spoke English, but could not be considered reliable. She was accompanied to the examination by her sister, Esung See. Plaintiff said she was in an automobile accident on February 9, 2007. She was driving and ran into the side of a bus. Plaintiff complained of continuing back pain, primarily in the lumbar region with bending, lifting and twisting. About twice a week, she had pain in her upper back with lifting, reaching, pushing and pulling. Her medications included Vicodin and Baclofen. Plaintiff reported that she could walk 2 blocks, could be on her feet for 1 or 2 hours at a time, could sit for 2 hours

moving around in a chair, and could lift 20 to 25 pounds.  Dr. Gurdin noted that Plaintiff was sleeping soundly in a chair when he came into the examining room.  AR 227.

On physical examination, Plaintiff's neck and thoracic areas were nontender with no muscle tightness.  Her manual dexterity, grip strength and arm strength were normal.  She was able to walk heel-to-toe, but showed poor balance.  She was able to walk on toes and heels.  She had slight generalized tenderness throughout the entire lumbar region, but no muscle tightness.  She also had a slightly positive Waddell sign with pain complained of throughout the thoracic and lumbar areas with gentle axial compression.  Her muscle strength was normal in both legs.  AR 228.

Dr. Gurdin diagnosed lumbar and thoracic myofascitis, minimally symptomatic, along with apparent borderline mentality with a learning disability.  Dr. Gurdin opined that Plaintiff might have some difficulty continuously bending or working in a bent over position.  She appeared capable of being on her feet for 2 hours at a time and for 6 out of 8 hours and probably could sit for these same lengths of time.  She also probably could lift and carry 20 to 25 pounds occasionally and 10 pounds more frequently.  AR 228.

On June 8, 2007, Plaintiff saw Dr. Ow-Yong and complained of back pain, shoulder pain and slow learning.  AR 301.

On July 3, 2007, Dr. Michael S. Barnett completed a consultative psychiatric evaluation.  Plaintiff's sister, Esung See, assisted in the interpretation of the interview.  Dr. Barnett noted that Plaintiff does not drive.  Her responses were slow and vague and she appeared dull intellectually and poorly groomed.  She did not know her chief complaint, but reported difficulty falling asleep, low energy, poor concentration, crying three times a week and feeling depressed.  AR 229.

On mental status exam, Plaintiff was depressed and her affect blunted.  She was unable to perform serial threes, giving no responses.  She repeated zero digits forward and zero digits backward.  She did not know the name of the current president and could not list any of California's geographical neighbors.  She could not perform simple mathematical calculations and recalled zero out of five objects in five minutes.  When asked to describe the difference and similarity between an apple and an orange, Plaintiff said, "They are not the same."  She was unable to interpret the

6

meaning of two simple proverbs and did not know what she would do if she was in a movie theater and a fire broke out or if she found a stamped, addressed letter on the sidewalk. AR 230. Dr. Barnett diagnosed Plaintiff with a depressive disorder not otherwise specified and mental retardation of unspecified severity, with a Global Assessment of Functioning ("GAF") of 55. Dr. Barnett concluded that Plaintiff's performance and presentation were poor and her lack of English and lack of adaptation to U.S. culture would prevent her from doing work-related tasks in an eight-hour work situation. She would not be able to understand and remember simple or complex work-related instructions and tasks. She would not be able to sustain focused attention and concentration long enough to complete routine work-related tasks in a timely and appropriate way without special or additional supervision. She would not be able to interact independently, appropriately and effectively with coworkers, supervisors and the public. She also would be incapable of adapting to changes, hazards or stressors in the work environment. Dr. Barnett opined that Plaintiff's prognosis was poor, she was mentally retarded and her problems were chronic and fixed. AR 230.

At some point, Dr. J. Levinson, Ph.D., a state agency consultant, opined that there was not enough information to accept the consultative psychiatrist's statement. Dr. Levinson recommended psych testing and a translator so that Plaintiff's sister was not involved. AR 232.

On September 22, 2007, Dr. Lance A. Portnoff, Ph.D, completed a consultative psychological examination. Dr. Portnoff obtained Plaintiff's social and medical history from two of Plaintiff's sisters. They reported that Plaintiff had attended special education classes throughout elementary and high school for a learning disorder. AR 233. She also had episodes of aggressiveness, including grabbing a knife and trying to hurt others. Plaintiff's sisters did not know about any PTSD event or symptoms. AR 234.

On mental status examination, Plaintiff was accompanied by her two sisters and an interpreter. She had mild psychomotor slowing and her understanding of English was better than her expressive language ability. Her thought process was coherent and organized. Her affect was characterized by mild blunting. Dr. Portnoff indicated that Plaintiff was basically alert and cooperative for all test procedures and was "probably making her best effort, so that the[] findings

7

[were] considered to be a valid representation of her current cognitive status." AR 234.

On the Wechsler Adult Intelligence Scale-III ("WAIS-III"), Plaintiff achieved a Full-Scale IQ of 56, which was within the range of Mildly Deficient Intellectual Functioning. Dr. Portnoff indicated that with the standard error of measurement, there was a 90% probability that her true Full-Scale IQ fell between 53 and 60. Plaintiff had impaired processing speed, concentration and basic attention. She also had a below-average fund of knowledge, oral vocabulary, verbal abstraction, and social judgment. She had deficient visual attention to detail, deficient non-verbal complex reasoning, deficient visual pattern recognition/analysis and deficient sequential organization. AR 234-35. The Vineland Adaptive Behavior Scales II was administered based on information obtained from Plaintiff's sisters and from direct observation/interview of Plaintiff. In the communication, daily living skills and socialization domains, Plaintiff's standard scores each fell at the <1st percentile rank. AR 235. Her adaptive behavior composition also feel at the <1st percentile rank. AR 236.

Dr. Portnoff concluded that Plaintiff's psychological testing was indicative of generalized deficits in verbal and visual skills, in attention/concentration and in processing speed. Her intelligence fell within the mildly deficient range and her adaptive functioning was very low, consistent with a diagnosis of mental retardation. Dr. Portnoff diagnosed a depressive disorder not otherwise specified by report and mild mental retardation, with a GAF of 55. Dr. Portnoff opined that Plaintiff had moderate-to-marked restrictions in daily activities, she needed total assistance or supervision with basic activities of daily living, she could not drive and she could not manage her money. She had moderate limitations in maintaining social functioning because of deficiencies in concentration, language, judgment and reasoning. She also had moderate difficulties with concentration, persistence and pace. AR 236. Dr. Portnoff further opined that Plaintiff was able to understand, carry out and remember simple instructions. She had moderate limitations in her ability to respond appropriately to co-workers, supervisors or the public, had mild limitations in her ability to respond appropriately to usual or routine work situations and had moderate limitations in her ability to deal with unexpected changes in a routine work setting. AR 237.

On November 1, 2007, Plaintiff sought treatment from Dr. Ow-Yong for mid-back pain. On

examination, she had normal full range of motion of all joints, along with normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed vicodin. AR 297-98.

On December 6, 2007, Plaintiff again saw Dr. Ow-Yong for back pain. On physical examination, Plaintiff had no edema or deformity of her extremities and normal full range of motion of all joints. She also had normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed vicodin for pain. AR 295-96.

On January 9, 2008, Lynn Harmston, a Fraud Investigator, and Carol Mouangkbot, a Disability Evaluation Analyst, both with the Cooperative Disability Investigation Unit for the Office of Inspector General ("OIG"), completed a Report of Investigation. AR 240-48. Investigator Harmston and Investigator Vial interviewed Plaintiff in her home on January 4, 2008. Plaintiff's mother and her sister, Esung See, stated that Plaintiff did not understand English very well. When Investigator Harmston asked Plaintiff repeatedly if she spoke English, Plaintiff finally shook her head in the affirmative. After providing her driver's license and identification, Plaintiff stated that she is a United States citizen and is able to speak and understand English. She was able to understand Investigator Harmston and the admonishment regarding furnishing false information and/or failing to disclose a material fact. AR 244-45.

Thereafter, Plaintiff told Investigator Harmston that she graduated from high school in 2004. She was in special education classes and was able to read and write English. She has a valid driver's license and admitted to driving in February 2007. Plaintiff thought that she was a safe driver and that she had no disorders which she felt needed to be reported to the DMV. AR 245.

Plaintiff told the investigators that she last worked as a child care provider and helper at her church. She worked at the church for over a year and helped with whatever needed to be done. She stopped working after being in the car accident. AR 245. Plaintiff stated that she was applying for disability because she was short and was unable work. AR 246. When Investigator Harmston indicated that being short was not a disability and asked Plaintiff if she had any physical or mental problems that prevented her from working, Plaintiff stated she wasn't sure if she had any other problems. Plaintiff indicated that she takes medication for the back pain caused by the February

2007 car accident. Plaintiff furnished three empty medication vials that were issued on August 17, 2007. Plaintiff was not sure if she was applying for disability due to the car accident. Plaintiff said she did not want to work or go to school and planned on living with her family. AR 246.

Plaintiff also told Investigator Harmston that she was able to care for her own needs as to bathing, dressing and grooming. During the day, she sleeps and listens to the radio. Although she was not required to do any chores around the home, she was able to do them. She also was able to go out of the home alone, but preferred to stay inside. She was able to stand and to sit for extended periods, but could not state how long. AR 246. She had no plans on a relationship or on getting married. She planned on living with family members the rest of her life and having them support her. She did not want to work and felt she would never be able to work again. AR 246. When Investigator Harmston asked Plaintiff's sister, Esung See, if she felt Plaintiff was unable to work, Ms. See stated she was not sure because Plaintiff had received SSI as a child for memory problems. Ms. See stated that the SSI stopped in 1993 so that Plaintiff could continue school. AR 246.

As part of the investigation, a counselor at Redwood High School in Visalia, California was contacted on January 9, 2008. The counselor reviewed Plaintiff's transcript and indicated that she was not in the all-day special education class. Rather, Plaintiff had special education classes in English, civics, economics and some math. Plaintiff received a C+ in geometry, which was a regular class during her last semester. She also attended a regular U.S. History class. Plaintiff received a grade point average of 2.58 and graduated one semester early because she attended summer and adult schools. AR 247 and 190.

Following the interview, Investigator Harmston opined that Plaintiff's allegations were not supported and her functioning levels were much higher than what she alleged on her function report. AR 241. It was noted that Plaintiff had inconsistencies in her claim. For instance, on her psychiatric evaluation, she was not able to perform serial threes and could not perform simple mathematical calculations, but according to her school information, she obtained a C+ in her Geometry class. AR 241 and 190. Additionally, Dr. Portnoff concluded that Plaintiff needed total assistance or supervision with basic activities of daily living and could not drive. However, according to driving

records, Plaintiff had a valid driver's license and during the interview with the investigators stated that she thought she was a safe driver and that she had no disorders which she felt needed to be reported to the Department of Motor Vehicles.  AR 241.  It also was noted that during the interview, Plaintiff was very evasive at the start and acted as if she did not understand the questions and did not speak English.  Plaintiff did speak English and the interview was conducted English.  AR 241-42.

On January 9, 2008, Plaintiff saw Dr. Ow-Yong for back pain.  On physical examination, Plaintiff had no deformity of the thoracic or lumbar spine, she had normal full range of motion of all joints and normal sensation, reflexes, coordination, muscle strength and tone.  Dr. Ow-Yong prescribed a toradol injection and vicodin.  AR 293-94.

On January 24, 2008, Dr. Craig A. Smith, a state agency physician, completed a Psychiatric Review Technique form.  Dr. Smith  reviewed the psychiatric and psychological consultative exams, along with the fraud investigation report.  He concluded that Plaintiff did not have a severe mental impairment.  AR 272, 282.

On February 14, 2008, Plaintiff sought follow-up treatment from Dr. Ow-Yong.  On physical examination, Plaintiff had no deformity of her thoracic or lumbar spine.  She had normal reflexes, coordination, muscle strength and tone.  Dr. Ow-Yong prescribed ibuprofen and a toradol injection for back pain.  AR 291-92.

On May 5, 2008, Dr. Wesley G. Jackson, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  Dr. Jackson found that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  She had no postural, manipulative, visual, communicative or environmental limitations.  AR 307-11.

Following a physical examination on August 5, 2008, Dr. Hanh Hoang diagnosed Plaintiff with a development delay NOS.  Dr. Hoang reportedly filled out a medical report form.  AR 328-29.

On August 29, 2008, Plaintiff complained of back pain.  Dr. Ow-Yong prescribed darvocet and a toradol injection.  AR 325-27.

On October 1, 2008, Plaintiff complained of lower back pain.  On examination, Plaintiff had

normal full range of motion of all joints and normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed ibuprofen and vicodin, along with a toradol injection. AR 323-24.

On January 6, 2009, Plaintiff saw Dr. Ow-Yong for back pain. On examination, she had normal full range of motion of all joints with normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed ibuprofen. AR 320-21.

On March 6, 2009, Plaintiff saw Dr. Ow-Yong and requested an injection. On examination, she had normal full range of motion of all joints with normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed a toradol injection. AR 318-19.

On October 22, 2009, Plaintiff saw Dr. Ow-Yong for back pain and medication refills. On examination, she had normal full range of motion of all joints with normal sensation, reflexes, coordination, muscle strength and tone. Dr. Ow-Yong prescribed ibuprofen. AR 315-16.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through June 30, 2008, and had not engaged in substantial gainful activity since February 1, 2007. The ALJ further found that Plaintiff had the severe impairments of lumbar strain post-motor vehicle accident and a learning disorder. Despite these impairments, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work. She could lift up to 20 pounds occasionally, could lift and carry up to 10 pounds frequently and could sit, stand or walk for 6 hours in 8-hour day with usual breaks. She also had the mental capacity to carry out simple routine work. With this RFC, the ALJ concluded that Plaintiff could perform jobs existing in the national economy. AR 19-26.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson*

12

*v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since February 1, 2007; (2) has an impairment or a combination of impairments that is considered "severe" (lumbar strain post-motor vehicle accident and learning disorder) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520(c)), 416.920(c); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) does not have any

past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy. AR 19-25.

Here, Plaintiff contends that the ALJ erred by: (1) discrediting her testimony; (2) rejecting Esung See's testimony; (3) relying on lay evidence from the fraud unit; (4) rejecting the opinions of examining physicians, Drs. Portnoff and Barnett; (5) failing to provide a complete RFC; (6) relying on invalid VE testimony; and (7) failing to find that Plaintiff met or equaled listings for mental retardation.

## DISCUSSION

A.   Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide sufficient reasons to discredit her. The Court disagrees.

An ALJ must make specific findings and state clear and convincing reasons to reject a claimant's symptom testimony unless affirmative evidence of malingering is suggested in the record. *Smolen v. Chater*, 80 F.3d 1273, 1283-84 (9th Cir. 1993); *see also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). Here, the ALJ found that Plaintiff was "purposefully misleading examiners" and had "systematically exaggerated her impairments" based, in part, on evidence contained in the fraud investigation report. AR 23, 24. This is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility. *See, e.g., Ambrose v. Astrue*, 2010 WL 3702645, *6 (N.D. Cal. Sept. 16, 2010) (noting investigation by OIG of potential fraud and malingering by plaintiff raised questions about the credibility of plaintiff's testimony with respect to her alleged impairments); *Filimoshyna v. Astrue*, 2009 WL 3627946, *9 (E.D. Cal. Oct. 29, 2009) (ALJ properly questioned plaintiff's credibility by referencing fraud investigation); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (when weighing credibility, ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying"); *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (ALJ may consider claimant's reputation for truthfulness in assessing credibility). More importantly, this evidence shows malingering.

Plaintiff concedes that "one might say the fraud investigators presented affirmative evidence

of malingering," but believes such evidence is "overcome with the expert opinions of the examiners and the lay testimony of the credible sister (according to Drs. Gurdin, Barnett, and Portnoff)." Opening Brief, p. 12. As discussed more fully below, these sources do not overcome the affirmative evidence of malingering. It is clear from the fraud investigation report that Plaintiff falsely presented to the examiners as someone who could not read or speak English and could not function without the assistance of others. Plaintiff's underlying suggestion that the ALJ should disregard such evidence because the fraud investigators were not trained medical professionals is absurd. Moreover, Plaintiff fails to address the additional reasons provided by the ALJ in discounting her credibility.

For instance, the ALJ considered inconsistent statements regarding Plaintiff's schooling and memory, along with her ability to speak and to understand English, her ability to drive and her ability to function independently. AR 24. An ALJ may properly consider inconsistencies in testimony or between testimony and conduct when weighing a claimant's credibility. *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007); *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ also considered Plaintiff's lack of physical therapy for back pain and her current use of over-the-counter medication for pain. AR 24. Evidence of "conservative treatment," such as a claimant's use of only over-the-counter pain medication, is sufficient to discount a claimant's testimony regarding severity of an impairment. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir.2007).

Additionally, the ALJ discounted Plaintiff's symptoms of chronic back pain because they were not objectively supported in the medical record. The ALJ noted that there was no evidence of limited range of movement, muscle spasm or weakness. AR 24. An ALJ may properly rely upon inconsistencies between a claimant's testimony and the medical record. Although a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of her pain, it is one factor that may be considered. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony"); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

For these reasons, the Court finds that the ALJ's credibility determination is supported by substantial evidence and is free of legal error.

B.      Esung See's Testimony

Plaintiff complains that the ALJ improperly preferred the fraud investigators' evidence over the lay evidence from Plaintiff's sister, Esung See. "When an ALJ discounts the testimony of lay witnesses, 'he [or she] must give reasons that are germane to each witness.' " *Valentine*, 574 F.3d at 694 (citation omitted). Here, the ALJ discounted the evidence from Plaintiff's sister because (1) she purposefully minimized Plaintiff's abilities and mislead the examiners; and (2) her statements regarding Plaintiff's functional capacity were unsupported by the medical record. AR 23, 24.

As an initial matter, the ALJ properly discounted Ms. See's lay testimony because he found she was purposefully misleading the examiners and minimizing Plaintiff's abilities. An ALJ does not err in discounting lay witness testimony where there is evidence that the specific witness exaggerated to assist a claimant in obtaining disability benefits. *Id.*; *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (ALJ permissibly rejected ex-girlfriend's lay witness testimony because her close relationship with claimant and desire to help him influenced her).

Plaintiff faults the ALJ for discrediting Ms. See's testimony based on the fraud investigator because the examining physicians all believed Ms. See was a "valuable translator and historian." Opening Brief, p. 11. However, it is the province of the ALJ to resolve any conflicting evidence and to make credibility determinations. *Magallanes v Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The report of the fraud investigator provides substantial evidence to discredit Ms. See's testimony.

Finally, the ALJ discounted Ms. See's opinion because it was unsupported by the medical record. AR 24. Inconsistency with medical evidence is a germane reason to discount lay witness statements. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."). In this case, Ms. See claimed that Plaintiff had memory problems since her car accident and she also had difficulty with self-care, could walk only 100 feet and could

16

maintain attention only 10 minutes at a time. However, the treating records did not show that Plaintiff suffered any serious injuries as a result of her car accident. Further, the consultative orthopedic examination did not show a loss of strength or a loss of range of motion in her back or legs. AR 24, 227-28.

The Court finds that the ALJ provided germane reasons for discounting Ms. See's testimony.

C.    Medical Opinions

Plaintiff claims that the ALJ erred by failing to give sufficient reasons for rejecting the medical opinions of Drs. Portnoff and Barnett regarding Plaintiff's mental retardation. In this case, the ALJ gave no weight to the opinions of Drs. Portnoff and Barnett because he found that Plaintiff and her relatives were purposefully misleading these examiners. The ALJ explained:

> I give no weight to Dr. Barnett's and Dr. Portnoff's examination findings, to their diagnoses of [Plaintiff], or to their opinions about her functional capacity. These were based in large part on [Plaintiff's] or her sisters' statements about her activities and history, and on her IQ testing. However, given the additional evidence in file, I conclude [Plaintiff] and her relatives were purposefully misleading the examiners. The consultative examiners' conclusions merit no weight because they are premised on [Plaintiff's] reliability, and she is not credible.

AR 23. The ALJ correctly found that the opinions of Drs. Portnoff and Barnett were based almost entirely on the reporting of Plaintiff and her sisters and on Plaintiff's own performance (or lack thereof) on test items. AR 229-30, 233-37. An ALJ may reject a physician's opinion if it is based on subjective reports that have been properly discounted as incredible. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (ALJ reasonably discounted a physician's prescription that was based on a claimant's less than credible statements); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may reject physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible). As the ALJ properly discounted the testimony of Plaintiff and Ms. See, the ALJ likewise properly discounted the opinions of Drs. Barnett and Portnoff premised on the reporting and performance of Plaintiff and on the reporting of her sisters.

Plaintiff asserts that the ALJ could not properly discount the opinions of Drs. Barnett and Portnoff based on the Ninth Circuit's decision in *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th

17

Cir. 2008). In *Ryan*, the court held that an ALJ "does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Id.* at 1199-1200. Plaintiff correctly notes that, as in *Ryan*, the examining physicians in this case provided their own clinical observations and did not discredit Plaintiff's complaints. However, the instant case is distinguishable from *Ryan*. Unlike in *Ryan*, the ALJ in this case had substantial objective evidence available to him demonstrating Plaintiff's lack of credibility. In other words, the ALJ had express evidence that Plaintiff was malingering. *Ryan* did not address the extent to which an ALJ may consider such objective evidence when determining the weight to accord a medical opinion.[2]

Plaintiff suggests that ALJ could not accept the opinion of Dr. Gurdin because he also based his opinion on Ms. See's interpretation and Plaintiff's history, including a diagnosis of mental retardation. Opening Brief, p. 8. Plaintiff is incorrect. According to the record, the ALJ accorded substantial weight to that portion of Dr. Gurdin's opinion regarding Plaintiff's physical functional

---

[2] In an unpublished opinion, the Ninth Circuit essentially rejected Plaintiff's argument that where a physician makes independent clinical findings and does not question the claimant's credibility, the ALJ must accept the opinion based upon a claimant's self-reporting, even if the record contains objective evidence that the self-reporting is not credible. *Calkins v. Astrue*, 384 Fed.Appx. 613, 615-16 (9th Cir. 2010). The majority in *Calkins* explained that applying *Ryan* as Plaintiff suggests could lead to a problematic result. To illustrate, the court stated:

> For example, suppose a physician had diagnosed a claimant with severe depression based primarily upon a self-reported history of suicide attempts. Suppose further that the record contained objective evidence, not available to the physician, that the claimant never had attempted suicide but had a history of lying to her doctors. Following the dissent's view of *Ryan*, an ALJ would be required to credit the diagnosis of depression as long as the *physician* believed the claimant and made at least some independent clinical findings, even if it were apparent to the ALJ that the physician's belief was based largely upon "facts" that turned out to be untrue. While it is not the role of an ALJ to second-guess physicians, ALJs must be able to consider medical opinions in the context of the record as a whole.

*Id*.
This example is materially indistinguishable from the instant case. As stated, the record here contained objective evidence, not available to the physicians, demonstrating Plaintiff's lack of credibility. The ALJ properly considered such evidence as part of the entire record.

18

capacity for light work, not her mental capacity. AR 22. Dr. Gurdin based this assessment on a physical examination, not reporting by Plaintiff or her sister. AR 21, 227-28.

Plaintiff also asserts that the ALJ should have accepted her IQ testing, deemed valid by both examining physicians, which was consistent with a diagnosis of mental retardation. Opening Brief, pp. 9. However, an ALJ may reject an IQ score if it is inconsistent with other observations. *See, e.g., Markosyan v. Sullivan*, 933 F.2d 1014 (9th Cir. 1991) (finding that IQ test resulting in a full-scale score of 59 was not credible when inconsistent with other observations); *see also Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992) ( "This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."); *Soto v. Secretary,* 795 F.2d 219, 222 (1st Cir.1986) (Secretary "is not obliged to accept results of claimant's I.Q. tests if there is a substantial basis for believing that claimant was feigning the results.")*; Strunk v. Heckler,* 732 F.2d 1357, 1360 (7th Cir.1984) (ALJ could reject I.Q. test.). The ALJ questioned the validity of Plaintiff's full-scale IQ below 59 based in part on (1) school records demonstrating that not all of her classes were special education; (2) she took extra adult school courses to graduate early from high school; (3) she maintained a 2.58 grade point average; (4) the fraud investigation report suggested malingering; and (5) DMV records demonstrated that she had a valid driver's license. AR 20-21, 23. As the evidence in the record was inconsistent with an IQ score of 59 or less, the ALJ properly viewed the scores as invalid. AR 20-21. Insofar as Plaintiff argues that Dr. Portnoff's opinion supports a finding that she met or equaled Listing 12.05 B and C for Mental Retardation, this argument is without merit. The ALJ properly rejected Dr. Portnoff's findings, including the IQ scores obtained by Plaintiff, based on substantial evidence in the record.

D.      RFC Finding and Vocational Expert Testimony

Plaintiff asserts that because the ALJ improperly rejected the opinions of Drs. Portnoff and Barnett, the RFC was defective and the resulting hypothetical questions and VE testimony were unsupported. The hypothetical posed to the vocational expert must accurately reflect the claimant's physical and mental limitations that are determined credible and supported by the record. However,

19

the ALJ may exclude restrictions in the hypothetical that are unsupported by the record or discredited as unreliable.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-64 (9th Cir.2001); *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir.1991); *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988).  As discussed above, the ALJ properly rejected the limitations imposed by Drs. Portnoff and Barnett.

### **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Mashet See.

These findings and recommendations will be submitted to the Honorable Lawrence J. O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **March 6, 2012**              /s/ **Dennis L. Beck**
                                         UNITED STATES MAGISTRATE JUDGE

20